**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | | |
|---|---|---|
| AMRAN PROPERTY INVESTMENTS, LLC, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 20 C 7464 |
| FIDELITY NATIONAL TITLE GROUP, INC. and FIDELITY NATIONAL TITLE COMPANY, LLC, | ) | Judge Joan H. Lefkow |
| Defendants. | ) | |

**OPINION AND ORDER**

Plaintiffs Amran Property Investments, LLC, FM Real Estate, LLC, One Mark Properties, LLC, Oak Real Estate, LLC, Qfors Real Estate, LLC, and Syntaxme, LLC brought an action against defendants Fidelity National Title Group, Inc. and Fidelity National Title Company, LLC (collectively Fidelity), alleging claims for aiding and abetting fraud, negligent misrepresentation, and negligence. (Dkt. 8.) Fidelity has moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). (Dkt. 12.) For the reasons below, the motion is granted, allowing plaintiffs leave to replead their aiding and abetting fraud claim.[1]

[1] This court has jurisdiction under 28 U.S.C. § 1332. All plaintiffs' members are citizens of foreign countries, Fidelity National Title Group, Inc. is a citizen of Delaware and Florida, Fidelity National Title Company, LLC is a citizen of Delaware, and the amount in controversy exceeds $75,000. Venue is proper under 28 U.S.C. §§ 1391(b)(2), (c)(2).

**BACKGROUND**[2]

Patrick Kavanaugh, a member/manager of Chicago P.C., LLC, approached several prospective investors who lived outside of the United States with a business opportunity to acquire housing properties in Chicago and lease them to tenants who were eligible for federal rental assistance under section 8 of the Housing Act of 1937, 42 U.S.C. § 1437f, which is administered locally through the Chicago Housing Authority (CHA). (Dkt. 8 at 4, ¶15.) Chicago P.C., with the legal assistance of attorney Alex Ogoke, formed Illinois limited liability companies (the plaintiffs in this action) to acquire the properties. (*Id*. at 4, ¶16.) Ogoke also represented Chicago P.C. in connection with various real estate transactions. (*Id*. at 2, ¶3.)

Between April 20, 2019, and March 27, 2020, plaintiffs purchased 20 properties from Chicago P.C., which had purchased those same properties from third parties using plaintiffs' funds before reselling to plaintiffs. (*Id.* at 5, ¶¶23–24; *see id*. at 6–10, ¶¶35–54.) Fidelity[3] served as the escrow and closing agent and provided title insurance for each of these transactions; one Fidelity salesperson, Brandon James, worked on all 20 sales, and another Fidelity employee, Zjacobe Synder, closed almost every transaction. (*Id.* at 2–4, ¶¶5, 12–14.)

Fidelity created double-escrow accounts for each of these transactions and received $500,000 for doing so, as well as additional payments for escrow and closing service fees and selling title insurance to plaintiffs. (*Id.* at 2, ¶6.) Fidelity did not inform plaintiffs that they were

[2] The factual basis for this motion under Rule 12(b)(6) is based on the well-pleaded facts and reasonable inferences drawn therefrom. *See infra* Legal Standard.

[3] The amended complaint defines defendant Fidelity National Title Insurance Group, Inc. as "FNTIG" and defendant Fidelity National Title Company LLC as "FNTC LLC." But the amended complaint never references those acronyms again, but instead uses "Fidelity" with plural pronouns. Construing the amended complaint liberally, "Fidelity" includes both defendants.

using double-escrow accounts or that Chicago P.C. was buying and re-selling the properties on or around the same day. (*Id*. at 13, ¶74.)

In the midst of these transactions, on October 11, 2019, James wrote a letter (the specific intended recipient unknown) affirming that Fidelity had a long-standing relationship with Chicago P.C. (*Id*. at 5–6, ¶¶31–32.) The letter stated that "Chicago P.C., LLC has been a customer of Fidelity Title Company for over 4 years. Our title company has handled all its escrow closing and escrow accounts." (*Id.* at 5–6, ¶31.) The letter invited recipients of the letter to contact Fidelity employees about Chicago P.C. (*Id.*) The letter was sent to Ogoke "and/or" Kavanaugh, who then forwarded it to plaintiffs. (*Id*. at 6, ¶32) The letter reassured plaintiffs in their decision to move ahead with the property transactions. (*Id*. ¶34.)

Ogoke, who was also a title agent for Fidelity, acted with powers of attorney for both Chicago P.C. and plaintiffs. (*Id*. at 2, 5, ¶¶6, 25.) "The powers of attorney documents purportedly signed by Plaintiffs were notarized by a member of Ogoke's law firm, even though" plaintiffs neither met Ogoke nor any notary public at his law firm; in fact, members of the plaintiff LLCs never travelled to the United States. (*Id*. at 5, ¶¶26–27.) Fidelity did not inspect or review the powers of attorney documents for forgery or false notarization. (*Id*. ¶28.)

After all transactions closed, Chicago P.C. informed plaintiffs that it would guarantee the properties' rent payments for the first year as well as "manage the properties, qualify the properties for CHA Section 8 benefits, lease units to tenants, collect rents and remit the funds to Plaintiffs, less a management fee[.]" (*Id.* at 4, ¶¶18–19.) "Shortly after" the closings, however, rent payments stopped and plaintiffs discovered that the properties were "in disrepair, mostly uninhabitable, and in violation of city building codes." (*Id.* ¶¶20–21.) Plaintiffs received

estimates that it would cost over $1.1 million to make the properties habitable and rentable. (*Id.* ¶22.)

On April 9, 2020, plaintiffs reached out to Fidelity to confirm that it had written the October 11 letter stating that Chicago P.C. was an established client. (*Id.* at 6, ¶33.) James confirmed that he had written and sent the letter. (*Id.*)

Plaintiffs brought an action against Fidelity seeking to recover their entire property investment amount, among other damages, amounting to $1,314,000.00. In count I of the amended complaint, plaintiffs claim that Fidelity is liable for aiding and abetting Chicago P.C. and Ogoke's fraudulent investment scheme. (*Id.* at 10–11, ¶¶56–63.) Count II alleges that Fidelity negligently misrepresented information to plaintiffs by relying on Ogoke's purported authority to act on plaintiffs' behalf based on forged powers of attorney documents, not disclosing the same-day back-to-back real estate transactions, and not informing plaintiffs about false information in the real estate settlement statements. (*Id.* at 12, ¶¶65–69.) Count III raises a negligence claim, in which plaintiffs assert that Fidelity had a duty to ensure that their funds were not misused, and that Fidelity breached this duty by "falsely representing Ogoke's authority to act on behalf of Plaintiffs, by preparing false settlement statements, and by falsely affirming Chicago PC and Ogoke were reputable, reliable business partners." (*Id.* at 13, ¶71–75.)

**LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. A complaint must provide a defendant with fair notice of a claim's basis and it must be facially plausible. *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). The allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007). In considering a motion under Rule 12(b)(6), all well-pleaded facts in the complaint are

accepted as true and all reasonable inferences from those facts are drawn in plaintiff's favor. *See AnchorBank, FSB* v. *Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

Where, as here, fraud is alleged, "a party must state with particularity the circumstances constituting fraud," although intent may be alleged generally. Fed. R. Civ. P. 9(b); *see Hefferman* v. *Bass*, 467 F.3d 596, 601 (7th Cir. 2006). This requirement "ensures that plaintiffs do their homework before filing suit and protects defendants from baseless suits that tarnish reputations." *Pirelli Armstrong Tire Corp. Retiree Med. Ben. Trust* v. *Walgreen Co.*, 631 F.3d 436, 439 (7th Cir. 2011). Ordinarily, when alleging fraud, a complaint must include "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated." *Windy City Metal Fabricators & Supply, Inc.* v. *CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 (7th Cir. 2008). In other words, the "'who, what, when, where, and how' of the fraud — 'the first paragraph of any newspaper story.'" *Pirelli*, 631 F.3d at 441–42 (quoting *U.S. ex rel. Lusby* v. *Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009)). The level of particularity needed depends on the case, *see AnchorBank, FSB* v. *Hofer*, 649 F.3d 610, 615 (7th Cir. 2011), and courts must not "take an overly rigid view of the formulation." *Pirelli*, 631 F.3d at 442.

## **ANALYSIS**

### I. Count I: aiding and abetting fraud

In Count I, plaintiffs allege that Fidelity aided and abetted Chicago P.C. and Ogoke's "fraudulent real estate investment scheme" by failing to prevent Chicago P.C. and Ogoke's false statements and misappropriation of funds, failing to discover that powers of attorney documents were forged, and by performing closing and escrow services for them. (Dkt. 8 at 10–11, ¶¶58–62.)

Under Illinois law, to state a fraud claim a plaintiff must allege "(1) that the [a person] made a statement; (2) of a material nature; (3) which was untrue; (4) known by the person making it to be untrue, or made in culpable ignorance of its truth or falsity; (5) relied on by the victim to his detriment; (6) made for the purpose of inducing reliance; and (7) the victim's reliance led to his injury." *Gen. Elec. Credit Auto Lease Inc.* v. *Jankuski,* 532 N.E.2d 361, 363 (Ill. App. Ct. 1988). Where fraud is alleged, a plaintiff also may hold others liable for aiding and abetting that fraud, as plaintiffs seek to do here, by pleading that "(1) the party whom the defendant aids performed a wrongful act causing an injury, (2) the defendant is aware of his role when he provides the assistance, and (3) the defendant knowingly and substantially assisted the violation." *Fifth Third Mortg. Co.* v. *Kaufman*, 934 F.3d 585, 588 (7th Cir. 2019). All claims involving fraud that are brought in federal court, including an aiding and abetting theory of liability, must satisfy Rule 9(b)'s heightened pleading standard. *Champion Parts, Inc.* v. *Oppenheimer & Co.*, 878 F.2d 1003, 1008 (7th Cir. 1989).

Fidelity first moves to dismiss this claim on the basis that plaintiffs have not alleged an actionable underlying fraud, only promissory fraud. (Dkt. 13 at 7.)[4] Promissory fraud "is a form of fraud based upon a representation of intent concerning future conduct, *e.g.*, a promise to perform a contract when there is actually no intent to perform the contract." *Jankuski,* 532 N.E.2d at 363–364. Promissory fraud is not actionable unless the promise is part of a scheme to defraud. *Id.* at 384. The distinguishing features of a scheme "are not clear in Illinois case law, and the exception, therefore, seems to engulf the general rule." *Gagnon* v. *Schickel*, 983 N.E.2d 1044, 1055 (Ill. App. Ct. 2012) (cleaned up). A scheme exists when "the misrepresentation is

[4] Fidelity also argued that the economic loss rule, *see infra* section II, barred this claim. (Dkt. 13 at 11–13.) But that rule is inapplicable because fraud and aiding and abetting fraud are intentional torts and, if properly alleged, fall under an exception to the rule.

embedded in a larger pattern of deception or the deceit is particularly egregious." *JPMorgan Chase Bank, N.A.* v. *Asia Pulp & Paper Co., Ltd.*, 707 F.3d 853, 865 (7th Cir. 2013). It "requires something more than a breach of a future promise" and "fraudulent intent exist[ing] at or before the time that the promise was made." *Transco Lines, Inc.* v. *CarrierDirect, LLC*, No. 19 C 4307, 2020 WL 1503576, at *3 (N.D. Ill. Mar. 30, 2020)

In response to Fidelity's argument, plaintiffs assert that Fidelity "admit[s] that Chicago PC is a fraudster" and "acknowledge[s] that Chicago PC lied to Plaintiffs and committed fraud." (Dkt. 17 at 4.) But that is inaccurate, for Fidelity's "first and primary argument against Count I is that Plaintiffs have not pled any fraud actionable under Illinois law." (Dkt. 18 at 1; *see* dkt. 13 at 7–8 (section IV.B.1.).) Plaintiffs' misrepresentation of Fidelity's position and failure to offer any response, let alone explain how the alleged promises amount to a fraudulent scheme, results in waiver. *See Alioto* v. *Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (waiver applies "where a party fails to develop arguments related to a discrete issue"); *Bonte* v. *U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").

A response on this point is critical because their allegations of fraud are opaque and do not meet the level of particularity demanded by Rule 9(b), including the time, place, content, and method of the misrepresentation that was made by Kavanaugh of Chicago P.C. to the investors or members behind the plaintiff LLCs.

Rather, what is alleged are two separate phases of transactions, some of which involve broken promises. First, Chicago P.C. promised to "identify," "coordinate purchase/sales transactions," and "sell" properties to plaintiffs "that would qualify for CHA Section 8 rent assistance" or "would be rentable, income-producing investments" (Dkt. 8 at 2, 4, 10, ¶¶4, 15, 57(a).) That promise was fulfilled. There are no promises regarding the condition of the

properties, only that they "would qualify" for section 8 rental assistance or "would be rentable." (*Id.* at 2, 10, ¶¶4, 57(a)).) Without more, the representation that the properties "would qualify" or "would be rentable" is vague. And plaintiffs do not allege that Chicago P.C. knowingly sold properties to plaintiffs that would not qualify for section 8 assistance or would not be rentable. Further, "most" but not all properties were not rented (dkt. 8 at 4, ¶21), and plaintiffs do not explain which specific properties fell short of expectations and for what reason. Moreover, post-closing, Chicago P.C. also promised to qualify the properties for section 8 rent assistance (*id.* at 10, ¶57(b)), suggesting that section 8 approval was not required at the time of sale. And conspicuously absent from the amended complaint are specifics about the investors behind or members of the plaintiff LLCs and the particulars of the promises made to them.

In the second phase, "[a]fter the transactions closed," Chicago P.C. "represented to Plaintiffs that it would manage the properties, qualify [them] for CHA Section 8 benefits, lease units to tenants, collect rents and remit the funds to Plaintiffs, less a management fee" and it "also guaranteed the rent payments for the first year for each property leased." (Dkt. 8 at 4 ¶¶18, 19.) Again, the amended complaint is missing particulars as to whom the promises were made, the time, place, and other surrounding circumstances. Nevertheless, these were broken promises.

But, regardless of whether the promises amount to a scheme to defraud, they are unrelated to the first phase promise. Thus, it does not necessarily follow that the post-closing promises can be lumped together with the initial promise to identify properties to buy because the post-closing promises could not have induced plaintiffs to buy the properties that form the basis of their damages. Further, there are no allegations that Fidelity was generally aware of or knowingly and substantially assisted in selling properties that would not qualify for section 8 assistance or would not be rentable based on the condition of the properties. And there are no

allegations that Fidelity knew that Chicago P.C. or Ogoke would make a new set of promises after closing on the last property.

Finally, the role of the back-to-back property transactions and how it contributed to the alleged fraud is not explained. (*Id.* at 5, ¶¶23–24.) Also unclear is the scope of authority that Chicago P.C. and Ogoke had to act on plaintiff LLCs' behalf when they were the ones who set up the plaintiff LLCs for the undisclosed investors in the first place. (*Id.* at 4, ¶16.)

Therefore, both plaintiffs' failure to respond to Fidelity's argument on this point and the lack of particulars of a scheme to defraud require the dismissal of this claim. Count I is dismissed without prejudice. Plaintiffs are granted leave to replead, if possible, to supply allegations of a scheme to defraud and which involves Fidelity as an aider or abettor.

## II. Counts II and III: tort claims for negligent misrepresentation and negligence

In counts II and III, plaintiffs seek to recover for their economic losses through negligent misrepresentation and negligence claims, both tort theories of recovery. (Dkt. 8 at 12–14.) But under the Illinois economic loss rule announced in *Moorman Manufacturing Co.* v. *National Tank Co.*, plaintiffs may not recover in tort for solely economic loss based on the properties that they bought. 435 N.E.2d 443, 453 (Ill. 1982).

There are, however, several exceptions to this rule: (1) personal injury or property damage from a sudden or dangerous occurrence; (2) intentional fraud; (3) negligent misrepresentation by a defendant that is in the business of supplying information for the guidance of others in their business transactions, *see In re Chi. Flood Litig.*, 680 N.E.2d 265, 275 (Ill. 1997); and (4) where the tort duty is extra-contractual, *see Congregation of the Passion, Holy Cross Province* v. *Touche Ross & Co.*, 636 N.E.2d 503, 514–15 (Ill. 1994) (professional malpractice). Plaintiffs argue that their claims fall under the third and fourth exceptions. (*See generally* dkt. 17 at 12–17.)

For the third exception, plaintiffs argue that they have alleged that Fidelity made misrepresentations and omissions and that "Fidelity, as closing agents, are in the business of supplying information for the guidance of others in their business transactions." (*Id.* at 12 (citing dkt. 8 at 13, ¶73).) Plaintiffs claim the following misrepresentations were made: (1) failing to disclose that Ogoke's powers of attorney documents granting him the authority to act on their behalf were forged even though Fidelity had "knowingly accepted" them; (2) failing to disclose that there were back-to-back property transactions using double-escrow accounts; (3) misrepresenting the accuracy of the settlement statements; and (4) affirming that Chicago P.C. and Ogoke were reputable and reliable. (*Id.* at 10–11.)

None of these statements is a false statement of material fact made by Fidelity. First, Ogoke's supplying forged powers of attorney documents to Fidelity is not a misrepresentation by Fidelity to plaintiffs. Second, Fidelity's alleged failure to inform plaintiffs about the back-to-back transactions is not a false statement of material fact. If Ogoke had been acting on plaintiffs' behalf for the transactions (fraudulently or not), it is not explained how or why Fidelity, which is not alleged to know about the forged documents or would have discovered so after exercising reasonable care, would communicate directly with plaintiff LLCs. Third, there are no pleaded facts describing any falsehoods in the real estate settlement statements. (*See id.* at 12–13, ¶¶67–68, 72.)

Fourth, there are no pleaded facts explaining how Fidelity falsely affirmed that Chicago P.C. and Ogoke were reputable and reliable. The investors behind the plaintiff LLCs went into business with Chicago P.C. and Ogoke before Fidelity ever came into the picture. The only alleged representation that Fidelity made to plaintiffs concerning Chicago P.C. was through the October 11 letter, when it confirmed that Chicago P.C. had "been a customer of Fidelity . . . for

over 4 years" and Fidelity had "handled all its escrow and closing and escrow accounts." (*Id.* ¶31). Yet plaintiffs do not allege that those statements, which do not make any explicit representation about Chicago P.C.'s reputation or reliability, were false. Further, Fidelity sent the letter after the transactions had already begun and Fidelity confirmed for plaintiffs that it had written the letter after all transactions completed, so its materiality is doubtful.

Plaintiffs also have not alleged facts showing that Fidelity's closing agent services involved supplying information to others in their business transactions. Although determining whether a defendant owes a duty is a case-specific inquiry based on the nature of the information at issue and its relation to the kind of business being conducted, "[a]n allegation that defendant is in the business of providing information for the guidance of others is a legal conclusion that plaintiff must support with well-pleaded factual allegations." *Tolan & Son, Inc.* v. *KLLM Architects, Inc.*, 719 N.E.2d 288, 296 (Ill. App. Ct. 1999). Other than a single conclusory allegation that Fidelity is "in the business of supplying information for the guidance of others in their business transactions" (*id.* at 13, ¶73), the amended complaint contains no pleaded facts describing the nature of any of Fidelity's services, let alone closing agent services. *Cf. Freedom Mortg. Corp.* v. *Burnham Mortg., Inc.*, 720 F. Supp. 2d 978, 994 (N.D. Ill. 2010) (closing agents were in business of providing information to others where services were not incidental to a contractual duty or the performance of an act but instead performed "analytical work").

Regarding the fourth exception, plaintiffs argue that Fidelity, as an escrow agent, had an extra-contractual duty to the buyer and seller in a transaction based on a fiduciary duty. (Dkt. 17 at 13.) Under Illinois law, however, a fiduciary duty is not a tort duty, rendering this exception inapplicable. *See Kinzer* v. *City of Chi.*, 539 N.E.2d 1216, 1220 (Ill. 1989); *Wolinsky* v. *Kadison*, 987 N.E.2d 971, 991 (Ill. App. Ct. 2013); *see also Edelman* v. *Belco Title & Escrow, LLC*, 754

F.3d 389, 397 (7th Cir. 2014) (noting disagreement among district court decisions as to whether an escrowee's duties are limited to escrow instructions, but not deciding matter because parties agreed that "escrowees have only a limited duty to follow their instructions"). Plaintiffs also based their tort claims on Fidelity's role as closing agents (dkt. 8 at 12–13), not escrow agents, and they do not describe an extra-contractual duty for closing agents.

*Moorman* aside, plaintiffs fail to state plausible tort claims. For both tort claims, plaintiffs have not connected the alleged damages that are based on the condition of some of the properties to Fidelity's alleged negligence or negligent misrepresentations because Fidelity is not alleged to have or to have breached a duty related to the condition of the properties. Plaintiffs also fail to explain how the back-to-back property transactions contributed to or caused the damages that are based on the condition of some of the properties.

For the reasons already discussed, plaintiffs also have failed to plead facts showing that Fidelity had a duty (as closing or escrow agents) to prevent Ogoke or Chicago P.C. from taking certain actions during the closings when Fidelity was not alleged to be aware, or would have discovered with reasonable care, that Ogoke and Chicago P.C. were taking such actions. Nor have plaintiffs pleaded a misrepresentation by Fidelity.

For these reasons, plaintiffs' tort claims are dismissed with prejudice.

## CONCLUSION AND ORDER

Fidelity's motion to dismiss (dkt. 12) is granted. The aiding and abetting claim is dismissed without prejudice and the negligent misrepresentation and negligence claims are

dismissed with prejudice. Plaintiffs are granted leave to replead by September 21, 2021, the aiding and abetting fraud claim in a manner consistent with the court's Opinion.

Date: August 31, 2021

Joan H. Lefkow

U.S. District Judge Joan H. Lefkow